UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CYNTHIA THURSTON,<br><br>    Plaintiff,<br><br>    v.<br><br>MOUNT DESERT ISLAND HOSPITAL,<br><br>    Defendant. | Civil Action No. |

**COMPLAINT**
**JURY TRIAL REQUESTED**
<u>**INJUNCTIVE RELIEF REQUESTED**</u>

NOW COMES the Plaintiff, Cynthia Thurston ("Thurston"), by and through undersigned counsel, and complains against the Defendant, Mount Desert Island Hospital ("MDIH"), as follows:

JURISDICTION AND PARTIES

1. This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*, the Maine Family Medical Leave Requirement Act ("MFMLR"), 26 M.R.S. §§ 844 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Rehabilitation Act ("Rehab Act"), 29 U.S.C. §§ 701 *et seq.*, and the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*

2. Thurston is a United States citizen residing in Bar Harbor, Maine.

3. MDIH is a Maine nonprofit corporation that provides healthcare services in a hospital in Bar Harbor and clinics in Bar Harbor, Southwest Harbor, Northeast Harbor, and Trenton, Maine.

4.      MDIH had more than 500 employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

5.      MDIH had more than 50 employees working within 75 miles of the MDIH Community Health Center in Southwest Harbor for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

6.      MDIH had more than 15 employees working at the Community Health Center in Southwest Harbor for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

7.      MDIH operates a "program or activity receiving federal financial assistance" within the meaning of the Rehab Act.

8.      This Court has subject matter jurisdiction over Thurston's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

9.      Thurston filed a timely Charge of Discrimination against MDIH alleging unlawful disability discrimination with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

10.     On or about October 5, 2016 the MHRC issued a Notice of Right to Sue with respect to Thurston's state law claims.

11.     On or about October 26, 2016, the EEOC issued a Notice of Right to Sue with respect to Thurston's federal law claims.

12.     Thurston has exhausted her administrative remedies with respect to all claims set forth in this Complaint.

## JURY TRIAL DEMAND

13.     Pursuant to Federal Rule of Civil Procedure 38(b), Thurston hereby demands a jury trial on all issues triable of right by jury.

## FACTUAL ALLEGATIONS

14. Thurston was employed by MDIH from February 24, 1997 to October 5, 2015.

15. Thurston had (and has) multiple disabilities including severe chronic inflammatory eye disease (uveitis), chronic bowel disease (Crohn's Disease and IBS), inflammatory arthritis, and severe chronic pain.

16. These conditions substantially limit major life activities including digestion, seeing, and working when viewed in the absence of mitigating measures.

17. These conditions substantially limit the functioning of major bodily systems including the digestive and sensory (vision) systems.

18. These conditions significantly impair Thurston's health when compared to the general population.

19. Thurston has received treatment for her conditions for years including multiple visits per year to her medical providers and an ongoing treatment regimen including medications.

20. Thurston's conditions are "serious health conditions" and "chronic conditions" for purposes of the FMLA and FMLR.

21. MDIH regarded Thurston as a person with a disability.

22. Beginning in 2009, Thurston worked at the Community Health Center (CHC), which is a small outpatient clinic in Southwest Harbor.

23. Thurston was a Radiological Technologist and Laboratory Technician (Rad/Lab Tech).

24. Thurston worked 32 hours per week from 8 AM to 4:30 PM. from Monday, Tuesday, Wednesday and Friday. She was not required to work nights, weekends, call, or holidays.

25. Thurston was a very good employee. Her supervisors described her as "compassionate" and "a great addition to the team." Thurston received commendations for her work including one in July 2013 for teaching a co-worker to draw blood.

26. Prior to June 2015, Thurston's performance evaluations were always satisfactory or better.

27. Thurston's overall health declined in 2014 and she started missing time from work.

28. This was noted in Thurston's 2014 Annual Performance Evaluation.

29. On April 21, 2015, Thurston received a coaching for absenteeism. The coaching stated that Thurston had called in due to illness 44 days during the period from April 7, 2014 to April 7, 2015.

30. Thurston responded to the coaching in writing and explained what was causing her absences and what she was doing to address the problem. She wrote in part:

> "I have missed a considerable amount of work this year due to health reasons. I am suffering from autoimmune diseases (Crohn's disease as well as uveitis). These autoimmune processes have been in remission for 5 years with my taking chemotherapy and very strong immunosuppression. However, I have flared up again and have had considerable pain and nausea from the adjustments of medication. I also suffer from two bouts of intercranial hypertension which involved hospitalization as well as spinal taps. I have worked closely with several specialists and have had many dr's visits. At this point I am on triple the dose of chemo therapy and double the immunosupression. I have maintained open contact with my supervisor at work and have been able to get Leigh Ellen to cover for me for the majority of my missed time. My job is very important to me. In the past my supervisors have said that my missed time due to illness would be overlooked due to the fact that I had coverage. I have taken the steps to make sure that my position had sufficient coverage whenever possible. In the future I will try to limit my sick time."

31.     No one in management responded to Thurston's comments or suggested that Thurston could apply for intermittent FMLA leave or that accommodations should be considered other than Thurston getting coverage for her own absences.

32.     Lauri Braley-Kandutch, CHC Practice Manager, was Thurston's supervisor.

33.     MDIH claims that when Braley-Kandutsch noticed that Thurston had missed work on Mondays a number of times, she offered to switch Thurston's four day work week (from Monday, Tuesday, Wednesday and Friday) to Tuesday through Friday.

34.     This allegation is false. Braley-Kandutsch never discussed this with Thurston or made this offer.

35.     On about June 18, 2015, Thurston was given a less than satisfactory Annual Performance Evaluation based on attendance issues. Thurston was also given a Second Written Warning for continued absenteeism. (Thurston was never given a First Written Warning for absenteeism.)

36.     Thurston responded to the evaluation and the warning in writing and reiterated that her absences were for reasons related to her disabilities and serious health conditions. She wrote:

> In addition to my prior comments on my documentation of coaching, I wanted to make everyone aware that my immunosuppression as well as my chemotherapy doses have doubled (chemo tripled) and this makes my immune system very low. I have missed 2 days since the beginning of April due to the fact that I had a high fever and did not feel I should spread my illness to my patients or co-workers. Also my absences have been on Mondays because I was receiving my immunosuppression on Saturdays and I was ill from my treatments through the weekend and occasionally this would carry over until Monday. I will try to get my treatments done on Friday and hopefully that will make a difference.
>
> I also wanted to mention that I was given an internal verbal warning for my missed time on 4/7/15. I have missed 2 days (with coverage, so not a burden) in the past 2 months. These are within the allotted 'no more than one absence per month' stated in the documentation of coaching. I believe my poor evaluation as

well as the 2nd written warning to be of unnecessarily extreme measure. I never did receive a 1st written warning. I was also made to feel very intimidated by Mike Kiers as well as Lauri during my evaluation. I did not like the amount of negativity or the tone it was presented in. There was no mention of the excellent teamwork I put forth every shift I work. I do understand that I have missed a great deal of time with my illness, but there should be some balance reflected in a yearly evaluation. My patient STATS are through the roof compared to other health centers. This is extremely important and the volume of patients that want to be x-rayed and have labs drawn here are a result of my hard efforts and due diligence. I also go out of my way to help each and every one of my co-workers without being asked. Whether it is sitting at reception and answering phones, checking each MAS voicemail when they are busy or cleaning up the rooms after a patient procedure. I also took on performing EKGs which was a measure I met from last year's evaluation.

I think the morale at CHC has taken a serious nose dive over the past year. I try hard every day to help my co-workers as well as managers and doctors. This has in no way been reflected in my evaluation and I would like to see some sort of correction to reflect all of my hard work. My illness has been a hardship which I have been struggling with. I have noted the seriousness of my absences and will improve upon this. I would like to see balance and a just evaluation. I understand the need to be harsh when reprimanding an employee but credit should be given where it is due.

37.     On June 23, 2015, Braley-Kandutsch wrote an email to Director Joe Hasselbrack that Thurston had "made excuses" about her absences.

38.     Braley-Kandutsch's comment about Thurston making "excuses" evidences her hostility toward Thurston and her disabilities/serious health conditions.

39.     Thurston realized that her absences relating to her disabilities and serious health conditions and the failure of MDIH to work with her toward finding a solution were jeopardizing her job.

40.     On about July 2, 2015, Thurston requested a medical leave of absence for her Crohn's disease, uveitis, extreme fatigue, chronic pain, nausea, vomiting and diarrhea.

41.     Thurston worked more than 1,250 hours in the 12 months preceding her request for leave.

42. Thurston was entitled to her requested leave under the FMLA and FMLR.

43. Thurston's goal was to rest and focus on her health so that she would be able to return to work and perform her job without taking too much time off.

44. MDIH granted Thurston's request for time off in the form of FMLA on about July 13, 2015.

45. After Thurston requested time off, the Imaging division of CHC was transferred over and become part of the hospital's Medical Imaging department.

46. Robin Fisher, Interim Manager, Medical Imaging, became Thurston's new supervisor during her leave.

47. When Fisher was informed about Thurston's medical leave of absence, her immediate reaction was to express hostility and suspicion about Thurston's motives.

48. Fisher told other managers that Braley-Kandutsch was unaware of the medical problems Thurston was having until she applied for FMLA, which is completely false. Fisher told other managers that she felt that Thurston was using FMLA to manipulate the system.

49. On September 18, 2015, Fisher called to tell Thurston that she was Thurston's new manager and that Thurston's job at CHC no longer existed.

50. According to MDIH, it became clear during Thurston's medical leave of absence that her Rad/Lab Tech position was "not viable."

51. There is no basis in fact for MDI Hospital's claim. The Rad/Lab Tech position had been viable at CHC for 20 years. Susan Rose and Leigh Ellen Doyle performed the job before Thurston.

52. There continued to be the same need for a Rad/Lab Tech in the CHC.

7

53. Thurston was told that her new job was to be a "Rad/MA (medical assistant)" position within the hospital's Medical Imaging department.

54. Rad/MA Techs would rotate between CHC and the hospital Medical Imaging department.

55. Thurston was told that she would work at CHC for one or two days a week and the rest of the time at the hospital and that she would need to take call on Saturday and Sunday from 8 AM to 8 PM every 5th week.

56. Thurston told Fisher that she takes immunosuppression medication on the weekend and needs at least 48 hours to recover from the shot which brings on extreme fatigue as well as full body joint pain and very bad headache. Thurston also told Fisher that her uveitis prevented her from driving at night.

57. When MDIH eliminated Thurston's Rad/Lab Tech position, it created a new full time Phlebotomist position at CHC.

58. Thurston was qualified for the Phlebotomist position but the position was not offered to her.

59. Thurston did not even know about the new position until after she was terminated.

60. Thurston learned about the new position when she obtained and reviewed her personnel file after she was terminated. Her file included an email dated September 21, 2015 from Braley-Kandutsch to other managers explaining why she did not transfer Thurston to the Phlebotomist position. Braley-Kandutsch wrote that she had heard from a member of the CHC team that Thurston was talking about "suing the hospital."

61. In the same email, Braley-Kandutsch wrote, "I have posted a position for a full time Phlebotomist as CHC provides walk-in lab services and we must have reliable coverage at

all times, which Cindy [Thurston] did not provide even after several verbal, then written warnings."

62. When she wrote that email, Braley-Kandutsch knew that Thurston's absences were related to her disabilities and serious health condition and that she was on a medical leave of absence to improve her health and ensure that she could perform her job without excessive absences.

63. In another email to managers on September 24, 2015, Braley-Kandutsch opposed having to supervise Thurston going forward because of Thurston's "chronic absenteeism," her alleged "abuse of the system by going out on FMLA," and Thurston's alleged threat to "sue the hospital."

64. Fisher responded by promising Braley-Kandutsch that she would not let Thurston rotate out to CHC after all, she would require Thurston to work 100% of the time in the hospital-based setting.

65. The hospital-based Rad Tech position was substantially different than the one Thurston held when her medical leave of absence began.

66. In addition to the requirement of working nights, weekends and holidays, working in the hospital is far more physically demanding than working at the CHC.

67. Thurston was unable to perform the duties of hospital-based Rad Tech for the following reasons:

   a. She required weekly injections which she took on the weekend to avoid impact on her work week. The injections caused significant malaise that lasted up to 48 hours. Thurston was unable to work weekend call.

   b. Thurston took immunosuppressant medications and should not have been exposed to high levels of stress or to infectious patients in a hospital setting.

      c.  Thurston was unable to lift significant weight, routinely wear a heavy lead apron, transport heavy x-ray equipment, push patients on stretchers or heavy patients in wheelchairs or in general assist with lifting and moving patients. Those tasks were common in a hospital setting but not at the CHC.

68.    On September 21, 2015, Thurston wrote an email to Human Resources and protested that her job was drastically changed while she was on medical leave. Thurston explained why she would be able to return to her former job at the CHC but could not perform the Rad Tech job in a hospital setting.

69.    Thurston did not know about the new Phlebotomist position at CHC that was created so she did not mention that job as an alternative in her September 21, 2015 email.

70.    On September 25, 2015, Human Resources responded that Fisher had made the decision to have five Rad Techs rotate through CHC instead of having one Rad Tech assigned there full time. Fisher said that she "felt strongly that all rad techs should take their fair share of call and holiday rotation."

71.    Thurston was told that the Rad Tech job in Medical Imaging at the hospital was equivalent in terms of pay, benefits and distance from her home as the Rad/Lab Tech job she previously held.

72.    MDIH gave no consideration to Thurston's specific limitations with regard to hospital-based work.

73.    Fisher was not willing to provide Thurston with necessary accommodations afforded her by the ADA, MHRA and Rehab Act.

74.    On September 30, 2015, Thurston told Fisher that she wanted to apply for an extension of leave for one additional month.

75.    Fisher responded by telling Thurston that her absence was causing a staffing burden.

76. This was a burden of Fisher's own making.

77. Fisher could have alleviated the staffing burden by assigning Thurston to cover the Rad Tech work at the CHC instead of requiring her to work in the hospital.

78. Fisher could have alleviated the staffing burden by hiring per diems from the per diem pool to perform Thurston's job duties while she was on leave.

79. Fisher asked Thurston to have her doctor complete another medical certification form. She sent Thurston the wrong form and told Thurston that she would make a decision about her leave and look at the medical certification after the fact. That was at 11:45 AM on October 2, 2015.

80. Three hours later, at 2:47 PM on October 2, 2015, Fisher informed Thurston that "it has been decided that an extension of [her] medical leave will not be granted due to business necessity."

81. In an email dated October 2, 2015, Fisher indicated that she expected Thurston to resign when she was told that her leave would not be granted.

82. Thurston did not resign.

83. Thurston was unable to return to work due to MDIH's refusal to reinstate her to the position she had at the start of her leave or an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

84. Thurston was unable to return to work due to MDIH's refusal to provide her with reasonable accommodations for the limitations caused by her disabilities.

85. MDIH needed a full time Phlebotomist for CHC. Thurston was qualified for the position but MDIH failed to offer the position to Thurston. The position was offered to a relatively new, non-disabled employee (AS) on November 23, 2015.

86. On November 10, 2015, Thurston's doctor wrote a letter confirming that Thurston's medical conditions prevented her from taking weekend call; that she should not be routinely exposed to infectious patients in a hospital setting; that she was unable to lift significant weight, or wear a heavy lead apron, or push patients on stretchers or heavy patients in wheelchairs, or in general assist with lifting and moving patients. The letter also indicated that Thurston was determined to maintain gainful employment in spite of her limitations and that she strongly desired to return to her former employment and remain a productive member of the work force.

87. MDIH claims that it offered Thurston an equivalent position upon the expiration of her FMLA leave. The position offered was not equivalent. The schedule, hours, duties, working conditions, and location were all different and worse.

88. MDIH claims that it offered Thurston reasonable accommodations including part time employment and/or a place to sleep in case it was too dark for her to drive home. The accommodations offered by MDIH were ineffective. The position offered still required that Thurston take weekend call, be exposed to infectious patients in a hospital setting, lift significant weight, wear a heavy lead apron, push patients on stretchers or heavy patients in wheelchairs, and in general assist with lifting and moving patients.

89. MDIH eliminated Thurston's position at CHC because of her disabilities and her use of protected leave.

90. MDIH failed to transfer and/or hire Thurston into the phlebotomist position at CHC because of her disabilities and her use of protected leave.

91. MDIH failed to provide Thurston with reasonable accommodations.

92. MDIH excluded Thurston from work because of her known disabilities.

93. MDIH retaliated against Thurston for exercising her right to a medical leave of absence under the FMLA and FMLR.

94. MDIH retaliated against Thurston for requesting and needing reasonable accommodations under the ADA, MHRA and Rehab Act.

95. Fisher's and Braley-Kandutsch's conduct toward Thurston evidences their discriminatory and retaliatory animus.

96. The temporal proximity between Thurston's use of protected medical leave and her exclusion from work is evidence of a causal connection.

97. MDIH knowingly and willfully violated Thurston's rights under the ADA, MHRA, Rehab Act, FMLA and MFMLR.

98. MDIH unlawfully discriminated against Thurston with malice or reckless indifference to her rights.

99. As a result of MDIH's unlawful discrimination and retaliation against Thurston, she has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

100. Thurston has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and she will continue to suffer irreparable injury from her treatment by MDIH unless and until MDIH is enjoined by this court.

## COUNT I: MHRA
## UNLAWFUL DISCRIMINATION

101. Paragraphs 1-100 are incorporated by reference.

102. MDIH's conduct constitutes unlawful disability discrimination against Thurston in violation of the MHRA.

## COUNT II: MHRA
## FAILURE TO ACCOMMODATE

103. Paragraphs 1-102 are incorporated by reference

104. MDIH violated the MHRA by failing to provide Thurston with reasonable accommodations for her disability.

## COUNT III: MHRA
## UNLAWFUL RETALIATION

105. Paragraphs 1-104 are incorporated by reference.

106. MDIH violated the MHRA by retaliating against Thurston because she required and used a medical leave as a reasonable accommodation for her disability.

## COUNT IV: ADA
## UNLAWFUL DISCRIMINATION

107. Paragraphs 1-106 are incorporated by reference.

108. MDIH's conduct constitutes unlawful discrimination against Thurston in violation of the ADA.

## COUNT V: ADA
## FAILURE TO ACCOMMODATE

109. Paragraphs 1-108 are incorporated by reference.

110. MDIH violated the ADA by failing to provide Thurston with reasonable accommodation for her disabilities.

## COUNT VI: ADA
## UNLAWFUL RETALIATION

111. Paragraphs 1-110 are incorporated by reference

112. MDIH violated the ADA by retaliating against Thurston because she required and used medical leave as a reasonable accommodation for her disability.

### COUNT VII: REHAB ACT
### UNLAWFUL DISCRIMINATION

113. Paragraphs 1-112 are incorporated by reference.

114. MDIH's conduct constitutes unlawful discrimination against Thurston in violation of the Rehab Act.

### COUNT VIII: REHAB ACT
### FAILURE TO ACCOMMODATE

115. Paragraphs 1-114 are incorporated by reference.

116. MDIH violated the Rehab Act by failing to provide Thurston with reasonable accommodation for her disability.

### COUNT IX: REHAB ACT
### UNLAWFUL RETALIATION

117. Paragraphs 1-116 are incorporated by reference.

118. MDIH violated the Rehab Act by retaliating against Thurston because she required and used medical leave as a reasonable accommodation for her disability.

### COUNT X: FMLA

119. Paragraphs 1-118 are incorporated by reference.

120. MDIH violated Thurston's prescriptive and proscriptive rights under the FMLA.

### COUNT XI: MFMLR

121. Paragraphs 1-120 are incorporated by reference.

122. MDIH violated Thurston's prescriptive and proscriptive rights under the MFMLR.

### PRAYER FOR RELIEF

Thurston respectfully requests that the Court grant the following relief:

(a) Declare the conduct engaged in by MDIH to be in violation of her rights;

(b) Enjoin MDIH, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

(c) Order MDIH to employ her in her former position and/or front pay for future lost earnings;

(d) Award equitable-relief for back pay, benefits and prejudgment interest;

(e) Award compensatory damages in an amount to be determined at trial;

(f) Award punitive damages in an amount to be determined at trial;

(g) Award liquidated damages in an amount to be determined at trial;

(h) Award nominal damages;

(i) Award attorney's fees, including legal expenses, and costs;

(j) Award prejudgment interest;

(k) Permanently enjoin MDIH from engaging in any employment practices which discriminate on the basis of disability or use of protected medical leave;

(l) Require the Chief Executive Officer to mail a letter to all employees notifying them of the verdict against them and stating that MDIH will not tolerate discrimination in the future;

(m) Require that MDIH post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

(n) Require that MDIH train all management level employees on the protections afforded by the MHRA, ADA, Rehab Act, FMLA and MFMLR;

(o) Require that MDIH place a document in Thurston's personnel file which explains that MDIH unlawfully terminated her because of discrimination and retaliation; and

(p) Grant to Thurston such other and further relief as may be just and proper.

Dated: October 28, 2016                    */s/* Chad T. Hansen
                                           chansen@maineemployeerights.com

                                           */s/* Peter Thompson
                                           pthompson@maineemployeerights.com


                                           Attorneys for the Plaintiff

                                           MAINE EMPLOYEE RIGHTS GROUP
                                           92 Exchange Street 2nd floor
                                           Portland, Maine 04101
                                           Tel. (207) 874-0905
                                           Fax (207) 874-0343